USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___6/29/18___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
BRUCE BORZON,                                        :
                                                     :
                              Plaintiff,             :
                                                     :            16-CV-7385 (VEC)
                                                     :
            -against-                                :            ORDER AND OPINION
                                                     :
TRACY V. GREEN and NEW YORK CITY                     :
HEALTH & HOSPITALS CORP.,                            :
                                                     :
                                                     :
                              Defendants.            :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff Bruce Borzon brings this action against Defendants New York City Health and

Hospitals Corporation ("HHC") and Tracy Green for employment discrimination and retaliation,

pursuant to 42 U.S.C. § 2000e *et seq.*, § 2000e–2(a)(1), and § 1981; the New York State Human

Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human Rights

Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*. *See* Complaint ("Compl.") [Dkt. 1].

Defendants moved for summary judgment on all claims. *See* Notice of Motion ("Notice of

Mot.") [Dkt. 26]. For the following reasons, Defendants' motion is GRANTED.

I.   **BACKGROUND**[1]

Plaintiff was formerly Senior Associate Director of Patient Financial Services at

---

[1]     All facts stated herein that are drawn from the parties' Local Civil Rule 56.1 Statements are undisputed
unless otherwise noted. Facts in this section are also drawn from deposition testimony and exhibits directly, and
cited as such where appropriate. The Court refers to the parties' filings with the following abbreviations:
Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Mem.") [Dkt. 27];
Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts ("D.S.") [Dkt. 28]; Plaintiff's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.") [Dkt. 34]; Plaintiff's
Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts and Statement of Additional
Material Facts ("P.S.") [Dkt. 37]; Defendants' Reply Memorandum of Law in Further Support of Their Motion for
Summary Judgment ("Reply") [Dkt. 40]; Defendants' Response to Plaintiff's Local Civil Rule 56.1 Statement of
Undisputed Facts ("D.R.S.") [Dkt. 41].

Metropolitan Hospital Center ("MHC"), one of many health care facilities in New York City administered by HHC. P.S. ¶ 1; Answer [Dkt. 13] ¶ 11. Borzon filed a charge of discrimination with the Equal Employment Opportunity Commission on July 17, 2015, and received a Notice of Right to Sue. P.S. ¶¶ 5–7. This lawsuit followed. P.S. ¶ 8; Compl. Plaintiff claims that he was terminated from MHC because he is white as well as in retaliation for filing an internal Equal Employment Opportunity ("EEO") Complaint. P.S. ¶¶ 3, 124–25, 128. He bases his claims on, *inter alia*, his disagreement with management over the quality of his performance; an allegedly overheard conversation among coworkers; and the fact that that his supervisor told him that their higher level supervisor did not want Borzon at MHC. *See* P.S. ¶¶ 126–27.[2]

### A. Borzon's Hiring and Orientation

In the spring of 2014, David Guzman, MHC's Deputy Chief Financial Officer, began a search for a Senior Associate Director in the Patient Financial Services ("PFS") Department, as the incumbent Inpatient Accounts Director was transitioning to a different position. P.S. ¶¶ 9–10, 15. Guzman's plan was to hire someone to lead both the Inpatient and Ouapatient sections of MHC's Finance Department. P.S. ¶ 12. After determining that the internal candidates were not qualified, MHC engaged a headhunter, and Guzman assembled a panel of Senior Finance Directors to interview candidates. P.S. ¶¶ 19–20; D.R.S. ¶¶ 223–24, 228. Two individuals were interviewed, Plaintiff and another man, both of whom are white. P.S. ¶¶ 23, 26. The panel recommended that the other candidate be hired because they believed him to be a better fit for a joint inpatient and outpatient role. P.S. ¶¶ 24–25. Guzman decided not to pursue the recommended candidate, however, because his salary demand was too high. P.S. ¶¶ 27.

---

[2] Plaintiff also complains that his coworkers did not chat with him, eat lunch with him, or exchange pleasantries, and that he was told his subordinates found him difficult to approach. P.S. ¶¶ 126–27. These additional complaints are never raised in Plaintiff's legal arguments or linked to the individuals who took adverse action against him and, therefore, will not be considered.

Guzman offered the job to Plaintiff, who accepted. P.S. ¶¶ 28–29. Plaintiff reported to Guzman, who, in turn, reported to Chief Financial Officer ("CFO") Tracy Green; Borzon also reported to and worked directly with Green. P.S. ¶¶ 31, 47. Ms. Green, who self-identifies as African-American and Hispanic, was hired two weeks after Plaintiff was hired. P.S. ¶¶ 45–46; D.R.S. ¶¶ 236–37.

Borzon's employment began in May 2014. P.S. ¶¶ 33–34; D.R.S. ¶ 232. He met with Guzman on his first day and received information about each area of the Finance Department for which he would be responsible. P.S. ¶ 35. Plaintiff's first major assignments included reorganizing and merging the Inpatient and Outpatient Departments and improving employee morale. P.S. ¶ 37; D.R.S. ¶¶ 285–86. Borzon was responsible for revenue management, and he understood that it was his responsibility to maximize hospital revenue. P.S. ¶¶ 38–39. His role in revenue management included managing accounts receivable and minimizing the aging of accounts receivable ("A/R Days"). P.S. ¶¶ 40–42.

### B. Initial Performance Assessment and Allegations of Bias

Borzon's performance was problematic from early in his tenure. After just a few months, Green had identified significant performance deficiencies and had noted that revenue and other relevant metrics were lower than expected. Excerpts of Deposition of Tracy Green, June 30, 2017 ("Green Depo.") [Dkt. 29-43] at 44:12–20; P.S. ¶¶ 50, 53–54. In an effort to improve Borzon's performance, Green made arrangements for Plaintiff to meet with his counterparts at other HHC hospitals, believing that his weak performance might have been due to a lack of understanding of HHC's billing systems; she hoped that meeting his counterparts would improve his performance. P.S. ¶¶ 51–52. In October or November 2014, Guzman told Plaintiff that

Green was unhappy with his performance and that he should begin to look for another job.[3]  P.S. ¶ 55.  Plaintiff was asked to complete a self-evaluation at that time.  P.S. ¶ 56.

In late 2014,[4] Guzman told Green that Plaintiff had reported to Guzman that he believed he was being targeted because of his race.  *See* P.S. ¶¶ 57–59.  The basis for Borzon's complaint was as follows:  Sharon Brown-Gross[5] allegedly told Borzon that she had overheard a conversation in which other employees were discussing Borzon.  P.S. ¶ 57; November 26, 2014 Guzman-Green Email ("November Email") [Dkt. 29-9].  Brown-Gross purportedly told Plaintiff that she had overheard Maria Davila and Susan Collymore[6] discussing, *inter alia*, how Plaintiff did not fit in with the team because he is white and that they were going to get rid of him.  P.S. ¶ 58; November Email.  Brown-Gross also purportedly heard another employee, April Alexander, who was MHC's Human Resources Director, admonish Davila and Collymore for having an inappropriate conversation.  P.S. ¶¶ 59–60; November Email.

---

[3]     Plaintiff contends that Guzman also told him: "Tracy [Green] is out to get you, look for another job, she wants to fire you."  Defendants dispute that Guzman said this and contend, in any event, that Plaintiff's version of the conversation is hearsay if intended to prove that Green wanted him fired as early as late 2014.  P.S. ¶ 55; Excerpts of Deposition of Bruce Borzon, June 26, 2017 ("Borzon Depo.") [Dkt. 29-5] at 56:2–4.  The Court discusses this conversation further below.

[4]     There is a factual dispute over exactly when Plaintiff allegedly learned of this conversation and reported it to Guzman.  Plaintiff points to a December 17, 2014, entry in his personal journal to support his assertion that it occurred in December 2014.  D.R.S. ¶ 248.  *See also* D.R.S. ¶ 247.  Defendants point to Guzman's email report to Green, which is dated November 26, 2014, to argue the conversation occurred in November.  P.S. ¶ 57.  There are multiple hearsay issues with this evidence, but the exact date of the conversation is not material.

[5]     In Borzon's report to Guzman, Brown-Gross's name was not used; she was referred to as an unnamed staff member.  P.S. ¶ 57.  Her identity was subsequently revealed when Borzon reported the incident to the EEO office.  P.S. ¶ 78.  At all times relevant to this case, Brown-Gross was a Hospital Care Investigator.  D.R.S ¶ 245.

[6]     During the period relevant to this matter, Maria Davila was the Senior Associate Director for the Managed Care Department, and Susan Collymore was a Senior Associate Director and Director of Admitting.  D.R.S. ¶¶ 242–43.

## C. January Formal Performance Review and EEO Complaint

On or around January 8, 2015, Plaintiff received his first performance evaluation from Guzman and Green, covering the period from May 5, 2014 to November 4, 2014, and then met with them to discuss the evaluation. P.S. ¶¶ 63–64, 66; D.R.S. ¶¶ 293–94; January Performance Evaluation ("Jan. Eval.") [Dkt. 29-10]. Plaintiff was rated "Needs Improvement" in 10 categories and "Fully Competent" in 13 categories; each rating was accompanied by a comment providing a basis for the rating. P.S. ¶¶ 67–68; D.R.S. ¶ 295; Jan. Eval. Plaintiff received an overall rating of "Needs Improvement," and the Evaluation included "Suggestions & Plans for Improvement."[7] P.S. ¶¶ 69–70; Jan. Eval. at 10. An HHC rating of "Needs Improvement" is appropriate when the employee's performance does not consistently meet the level of competence required and when some planned objectives were not achieved at the established standards. P.S. ¶ 71. HHC Procedures provide that a managerial employee who receives a rating of "Needs Improvement" must be reevaluated after three months, and if the manager's performance has not improved to "Fully Competent" or above, the employee is to be reassigned or terminated. P.S. ¶ 72.

On or around January 9, 2015, shortly after Plaintiff received his first evaluation, he met

---

[7]     The Suggestions and Plans for Improvement read as follows:

"Mr. Borzon was hired due to his many years of revenue cycle experience to optimize inpatient and outpatient patient Patient Accounts [sic] operations, primarily by consolidating both departments and redeploying staff so as to leverage the department's labor force, in the face of a changing healthcare delivery/reimbursement landscape. He is new to HHC, and as such, requires time to learn/master HHC's systems, management structure, unique way of doing business and culture. While latitude has been given with respect to the learning curve that is required to get him up to speed, Mr. Borzon's mastery of HHC's systems and processes has been slower than expected. Additionally, Mr. Borzon has had issues cultivating relationships with his colleagues. These relationships are essential to ensuring that all revenue cycle departments work in concert to optimize collections and ensure that resources are used in an efficient manner. There have also been instances where analyses/work coming from PFS has had errors. Mr. Borzon is expected to improve his relationship with his colleagues, ensure that work from PFS is reviewed and free from error, and get up to speed with respect to HHC's patient accounting systems and processes." Jan. Eval. at 10.

with MHC's EEO Officer, Luz Nazario.  P.S. ¶ 73.  Borzon complained to Nazario that he was

not wanted at MHC, that he was being set up by his peers, and that there was a racial issue.  P.S.

¶ 74.

On January 13, 2015, Plaintiff submitted a rebuttal to his evaluation and detailed what he

believed were his accomplishments during the rating period.  P.S. ¶ 75; First Evaluation

Rebuttal, January 13, 2015 ("First Eval. Reb.") [Dkt. 29-14].  On January 14, 2015, after having

submitted his rebuttal, Plaintiff emailed an internal EEO Complaint to Nazario, which reiterated

items that he had included in his evaluation rebuttal.  P.S. ¶ 76–77; D.R.S. ¶¶ 252–53; First Eval.

Reb.; Internal EEO Complaint, January 14, 2015 ("EEO Compl.") [Dkt. 29-15].  The EEO

Complaint also asserted that Brown-Gross had told him in September 2014[8] that she had recently

overheard Davila and Collymore discussing Borzon.  (This is the conversation discussed above

that Borzon reported to Guzman in late 2014.)  According to the EEO Complaint, Brown-Gross

told Borzon that she heard Davila tell Collymore, in Spanish, that "we have him now, he's white,

he doesn't belong here," and "Tracy is on board."  P.S. ¶¶ 78–79.  *See also* D.R.S. ¶ 247.  The

EEO Complaint further reported that Alexander also overheard the conversation and told Davila

and Collymore that "[it] sounds like you both need cultural sensitivity training."  P.S. ¶ 79.

Brown-Gross testified that she does not remember saying to Plaintiff any of the things he

attributed to her in his EEO Complaint.  P.S. ¶ 81.  Davila denied that the conversation ever

occurred, and Alexander reported no memory of such a conversation.[9]  P.S. ¶¶ 86–87.

---

[8]     Plaintiff later testified that the September date was wrong and that the conversation occurred in December 2014.  P.S. ¶¶ 78, 80.

[9]     The parties dispute whether Collymore speaks Spanish.  Defendants contend that she is not fluent, but Brown-Gross testified that she has "heard [Collymore] speak Spanish on the ward."  P.S. ¶ 82; Excerpts of Deposition of Sharon Brown-Gross, June 8, 2017 ("BG Depo.") [Dkt. 29-16] at 29:16–20; *see also* D.R.S. ¶ 244. The parties' also dispute Brown-Gross's Spanish abilities.  Defendants contend she is not fluent and understands very little Spanish; Brown-Gross testified that she knows enough Spanish to try to communicate with a patient to

**D. Action Plan and Second Formal Evaluation**

On or about January 29, 2015, Plaintiff met with Guzman and Green and was given a Performance Evaluation Action Plan for Improvement, which they reviewed with him. P.S. ¶¶ 89–90; Performance Evaluation Action Plan for Improvement, January 29, 2015 ("PEAP") [Dkt. 29-19]. The PEAP outlined eight areas and 21 steps for improvement. P.S. ¶ 92; PEAP. Plaintiff did not ask any questions during the meeting, and his salary and responsibilities did not change after the meeting. [10] P.S. ¶¶ 91, 93–94.

Shortly after Plaintiff was put on a PEAP, Green learned that Borzon had lodged an EEO Complaint. [11] P.S. ¶ 95; Green Depo. at 80:4–82:8. About a month later, Plaintiff responded to the PEAP and represented that the tasks set out in the PEAP had been completed. [12] P.S. ¶ 96.

---

complete a Medicaid application. P.S. ¶ 84; BG Depo. at 8:9–10:3; D.R.S. ¶ 246. These disputes are immaterial because the conversation is, as discussed below, inadmissible second- and third-hand hearsay.

[10] Prior to the meeting regarding the PEAP, Guzman provided Plaintiff a description of his job duties. Borzon made some handwritten changes, some of which were accepted by Guzman and others of which were not. Plaintiff argues that this indicates there was disagreement over his responsibilities, while Defendants argue that the document indicates that Plaintiff attempted to change his job description, and Guzman disagreed. *See* D.R.S. ¶¶ 266–70; Job Description Memorandum ("Job Memo") [Dkt. 35-2] at 34–37. Whether these changes and cross-outs reflect disagreement over Plaintiff's duties in January 2015 is immaterial. Although Plaintiff challenged the substance of his formal evaluations, he does not appear to dispute that they covered areas for which he was responsible, nor does he explain how this dispute over nuances in his job responsibilities supports his claims of racial discrimination.

[11] The parties dispute exactly when Green learned about Plaintiff's EEO Complaint, and both rely on Green's deposition testimony to support their position. *See* P.S. ¶ 95. While Green's testimony on this point is ambiguous and difficult to parse, it appears that she found out about the EEO Complaint around the same time that Borzon was put on a PEAP. *See* Green Depo. at 80:4–82:8. The exact date that Green learned of the EEO Complaint is immaterial because it does not affect the sequence of events or, as discussed below, whether her knowledge of the Complaint was sufficiently proximate in time to support Borzon's retaliation claims.

[12] Plaintiff takes issue with the fact that certain items in the PEAP had not been raised in his formal evaluations; Defendants respond that several of the items raised in the PEAP were in fact incorporated into the formal evaluations and that the issues with Plaintiff's performance were communicated to him orally at frequent in-person meetings. *See* D.R.S. ¶ 272. This dispute is immaterial because Plaintiff was made aware of any such additional performance issues no later than his receipt of the PEAP in January, and it is undisputed that Green and Guzman had raised various performance issues with Plaintiff orally and in his first formal evaluation in the months preceding the PEAP. Moreover, it is irrelevant whether the PEAP contained items not included in prior feedback because the issue at hand is not whether Guzman and Green were perfect managers who dotted every I and crossed every T for dealing with a poorly-performing manager. The issue is whether adverse action was taken against Plaintiff because of his race or to retaliate for his making an EEO complaint.

On March 4, 2015, Plaintiff received a second evaluation from Guzman and Green, which covered the period of November 5, 2014, to February 5, 2015. P.S. ¶¶ 97–98; March Performance Evaluation ("March. Eval.") [Dkt. 29-20]. Plaintiff was rated "Needs Improvement" in nine categories and "Fully Competent" in 15; his overall rating remained as "Needs Improvement." P.S. ¶¶ 99–100; March Eval. Some of the deficiencies identified in the first evaluation persisted into the second evaluation. P.S. ¶ 101. The second evaluation also noted that Plaintiff had received the PEAP on or around January 29, 2015, had been receptive to it, and had accomplished some of the deliverables outlined in the Plan. P.S. ¶ 102.

Green and Guzman met in March 2015 to discuss Plaintiff's performance, and both thought that it continued to be substandard. P.S. ¶¶ 103–04. Guzman and Green both believed that Plaintiff's removal from his position in the Finance Department was warranted.[13] P.S. ¶ 104. Notwithstanding her dissatisfaction with his performance, Green made arrangements for Plaintiff to interview for a different position at MHC. P.S. ¶ 105; Guzman Depo. 197:6–99:17; Green Depo. at 142:14–47:20. Green told Plaintiff that, although he was not working out in Patient Financial Services, he had been successful in some aspects of his work. P.S. ¶ 106–07; Green Depo. at 142:7–45:17; Guzman Depo. at 197:6–99:17. Green told Borzon that he might be a good fit for the Patient Experience Officer, and she made arrangements for him to be interviewed for that position. P.S. ¶ 108.[14]

---

[13] Plaintiff argues that Green did not believe that he should be fired, based on her testimony that she suggested Plaintiff work in a different role and never said that he should be terminated. P.S. ¶ 106; *see* Green Depo. at 142:7–47:23. But Defendants do not assert that Guzman and Green agreed that Plaintiff should be terminated, and the depositions of Guzman and Green are inconsistent as to whether they both thought he should be fired or just removed from his position in the Finance Department. P.S. ¶ 106; *see* Guzman Depo. at 197:6–99:17. There is no dispute, however, that both Guzman and Green believed that Plaintiff could not continue in his current position, even if they may have differed on whether he should be terminated from MHC.

[14] The parties dispute whether Green made certain assurances to Plaintiff regarding his future if he did not get the patient experience position. P.S. ¶ 106. But there is no dispute that Green told him he was not working out in Patient Financial Services and encouraged him to interview for another job at the hospital.

Before Plaintiff's interview for the new position, Green spoke to Alexander regarding Plaintiff's performance; Green reported that Plaintiff's performance had been poor, that he was unable to meet the needs of the Finance Department, and that MHC should look for other opportunities for him.[15]  P.S. ¶¶ 109–10.  Plaintiff was interviewed by MHC's Executive Director, Anthony Rajkumar, and the Chief Nurse Executive, Lillian Diaz, for the position of Patient Experience Officer, but he was not offered the position.  P.S. ¶¶ 111–12.

### E.  Plaintiff's Termination and Subsequent Replacement

Plaintiff was terminated on April 15, 2015.  P.S. ¶¶ 115–16.  On April 21, 2015, Plaintiff sought review of his termination.  P.S. ¶¶ 118.  Guzman and Green, who first learned that Plaintiff had been terminated after the decision had been made, provided Rajkumar, who reviewed the termination, with information about Plaintiff's performance.  P.S. ¶¶ 117, 119–20; D.R.S. ¶ 309.  On May 11, 2015, Rajkumar affirmed the decision to terminate Plaintiff.  P.S. ¶ 121.  Approximately six months later, Lynette Stover was hired as the new Senior Associate Director of Patient Financial Services.  P.S. ¶¶ 122–23.  Stover, who presents as African-

---

[15]     Defendants, citing Alexander's deposition testimony, further assert that Green recommended Plaintiff's termination, noting that separation would be appropriate if no other opportunities were available for him.  P.S. ¶ 110; Excerpts of Deposition of April Alexander, August 17, 2017 ("Alexander Depo.") [Dkt. 29-18] at 25:13–26:14.  Plaintiff disputes this, noting that Green, according to her deposition, did not believe she had any role in Plaintiff's termination and just recommended that he be removed from his role in the Finance Department.  P.S. ¶ 110; Green Depo. at 142:8–47:23.  Plaintiff does not address a March 27, 2015 email that Defendants also cite, in which Green (with a copy to Guzman) wrote to Alexander:  "Per our discussion, we have concluded that Mr. Bruce Borzon has not provided Sr. Associate Director level work overseeing the Patient Accounts department; as he has received the rating 'needs improvement' for his time here.  He has an interview next week with Lillian Diaz regarding the Patient Experience Officer position.  Once we get feedback from Lillian, we can then move forward with an appointment in Human Resources for either transfer or termination."  March 27, 2015 Email from Tracy Green to April Alexander ("Green Email") [Dkt. 29-22].  In effect, the dispute is whether Green, in addition to telling Alexander that Plaintiff performed poorly, recommending that he be removed from his position, and suggesting he interview for a different role, *also* recommended that he be terminated entirely.  The Court finds this dispute to be immaterial because the central issue, as explored below, is not whether one of Plaintiff's superiors thought he should be transferred to another role or terminated from MHC outright, but why she and others decided to remove him from his position as Senior Associate Director of PFS, a determination that preceded any decision by MHC to terminate his employment.

American, formerly worked with Green at a different hospital and had been informed by Green of the job opening.[16]  D.R.S. ¶¶ 279–82.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted).  To defeat summary judgment, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citation and internal quotation marks omitted).  Courts "construe the facts in the light most favorable to the nonmoving party . . . and resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009)) (omission in original) (internal quotation marks omitted).

"At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (citations omitted).  "A motion for summary judgment may be defeated where 'a plaintiff's *prima facie* case, combined with sufficient evidence to find

---

[16]	The parties dispute whether others were interviewed for the role, but that dispute is immaterial.  D.R.S. ¶ 283.

that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

### B. Defendants Are Entitled to Summary Judgment on Borzon's Employment Discrimination Claims

The fifth through eighth causes of action in the Complaint allege that Defendants discriminated against Borzon on account of his race when they terminated him. He argues this discrimination violated Title VII, § 1981, the NYSHRL, and the NYCHRL, respectively. *See* Compl. ¶¶ 58–76. Defendants move for summary judgment as to all four claims. *See* Notice of Mot.

#### 1. Applicable Law

Courts analyze employment discrimination claims brought under Title VII, § 1981, and the NYSHRL using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) . . . ." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citation omitted); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015) (citations omitted).

Because NYCHRL claims are construed more liberally than their federal and state counterparts, "[c]ourts must analyze [these] claims separately and independently from any federal and state law claims . . . ." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d

Cir. 2015) (citations omitted). "[O]n summary judgment, the employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." *Philip v. Gtech Corp.*, No. 14 CIV. 9261 (PAE), 2016 WL 3959729, at *10 (S.D.N.Y. July 20, 2016) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013)) (internal quotation marks and alterations omitted). "To prevail on a summary judgment motion under the NYCHRL, the employer is required to meet its burden of showing that, based on the evidence before the court and drawing all reasonable inferences in [plaintiff's] favor, no jury could find that the [defendant] treated [the plaintiff] 'less well' than other employees at least in part because of [his or] her race." *Id.* (quoting *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 Fed. App'x 10, 13 (2d Cir. 2013)) (internal quotation marks omitted).

Additionally, "[i]t is well established that a plaintiff cannot prevail on a Section 1981 claim against a municipality (or municipal agency . . . ) unless the alleged violation was caused by a custom or policy within the meaning of *Monell* [v. *N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)] and subsequent cases." *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 75 (S.D.N.Y. 2016) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36 (1989)) (internal quotation marks omitted). "Thus, to recover from [a municipal agency] pursuant to Section 1981, a [p]laintiff must show: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Id.* (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)) (internal quotation marks omitted). And when a municipal employee's supervisor is included as a defendant, a plaintiff must show that the supervisor was a "final

12

policy maker[] such that [her] actions can result in municipal liability for [the agency]." *Addo v. New York Health & Hosps. Corp.*, No. 15-CV-8103 (RA), 2017 WL 4857593, at *10 (S.D.N.Y. Oct. 25, 2017) (citation omitted).

### 2. Borzon Establishes a *Prima Facie* Case of Discrimination

A plaintiff establishes a *prima facie* case "if he or she introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor. [The plaintiff] must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted) (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). The plaintiff's burden of proof at this first step is minimal or *de minimis* and not onerous. *See Littlejohn*, 795 F.3d at 311 (citations omitted); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (citation omitted).

Because Defendants have conceded the first two elements of a *prima facie* case, the parties dispute only the final two prongs of this test: whether Borzon suffered an adverse employment action and whether the record raises an inference of discrimination. *See* Defs.' Mem. at 7.

#### i. Borzon's Termination Qualifies as an Adverse Employment Action, But his Evaluations and PEAP Do Not

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The action must be "more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Sanders*, 361 F.3d at 755) (internal quotation marks omitted); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation omitted). Additionally, "a plaintiff must set forth objective proof that the alleged action was materially adverse." *Potash v. Florida Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (citing *Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008)) (emphasis omitted).

Although Defendants concede that Plaintiff's termination qualifies as an adverse employment action, Defs.' Mem. at 7, the parties dispute whether Plaintiff's formal evaluations and PEAP also constitute adverse employment actions. *See* Defs.' Mem. at 5–6; Opp. at 20–21; Reply at 2.

The claims of discrimination in Plaintiff's Complaint are premised entirely on his termination and not on his evaluations or PEAP.[17] A court cannot consider claims raised in a plaintiff's opposition to a defendant's motion for summary judgment but not included in the complaint. *See, e.g.*, S*cott v. City of New York Dep't of Correction*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (citations omitted), *aff'd sub nom. Scott v. New York City Dep't of Correction*, 445 F. App'x 389 (2d Cir. 2011). Accordingly, whether the evaluations and PEAP qualify as adverse actions is irrelevant, as they were raised as bases for Plaintiff's discrimination claims for the first time in Plaintiff's opposition to Defendants' motion for summary judgment.

---

[17] *See, e.g.*, Compl. ¶ 59 ("Title VII makes it unlawful for an employer to 'discharge any individual . . . because of such individual's race . . . .' 42 U.S.C. § 2000e–2(a)(1)."); ¶ 62 ("As evidenced by, *inter alia*, the conversation in mid-December 2014 described in paragraph 23, *supra*, the decision to terminate Mr. Borzon's employment occurred under circumstances which give rise to an inference of discrimination."); ¶ 66 ("As evidenced by, *inter alia*, the conversation in mid-December 2014 described in paragraph 23, *supra*, the decision to terminate Mr. Borzon's employment occurred under circumstances which give rise to an inference of discrimination."); ¶ 70 ("As evidenced by, *inter alia*, the conversation in mid-December 2014 described in paragraph 23, *supra*, the decision to terminate Mr. Borzon's employment occurred under circumstances which give rise to an inference of discrimination."); ¶ 75 ("As evidenced by, *inter alia*, the conversation in mid-December 2014 described in paragraph 23, *supra*, the decision to terminate Mr. Borzon's employment occurred under circumstances which give rise to an inference of discrimination.").

But even if the evaluations and PEAP had been timely raised in the Complaint as adverse

employment actions, the law quite clearly forecloses this argument. "Negative evaluations can

be adverse employment actions only if they give rise to material adverse changes in work

conditions." *Kpaka v. City Univ. of New York*, No. 14-CV-6021 (RA), 2016 WL 4154891, at *7

(S.D.N.Y. Aug. 2, 2016) (quoting *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528

(S.D.N.Y. 2002)) (internal quotation marks omitted), *aff'd*, 708 F. App'x 703 (2d Cir. 2017). Put

differently, a negative performance review is not itself an adverse employment action,[18] and a

subsequent termination does not transform it into one. *See, e.g.*, *Chung v. City Univ. of New

York*, 605 F. App'x 20, 22 (2d Cir. 2015) (citation omitted); *Potenza v. W. Irondequoit Cent. Sch.

Dist.*, No. 06-CV-6407, 2009 WL 2876204, at *7–10 (W.D.N.Y. Sept. 2, 2009) (finding that

performance evaluations and counseling meetings were not adverse employment actions even

though they were followed by suspension and termination, which were adverse employment

actions). There is no evidence that the performance evaluations or PEAP themselves had any

material adverse effect on Plaintiff's work conditions, and Plaintiff admitted that his salary and

responsibilities did not change following his receipt of the PEAP. *See* P.S. ¶¶ 93–94; Borzon

Depo. at 136:11–16. Therefore, Plaintiff's discrimination claim must rise or fall based on his

termination.[19]

---

[18] This is true as well for the NYSHRL and NYCHRL claims. *See, e.g.*, *Mejia v. Roosevelt Island Med. Assocs.*, 944 N.Y.S.2d 521, 524 (1st Dept. 2012) ("As none of these negative evaluations resulted in any reduction in pay or privileges, they do not support plaintiff's claim of discrimination.") (citation omitted); *Sirota v. New York City Bd. of Educ.*, 725 N.Y.S.2d 332, 333 (1st Dept. 2001) (finding that, *inter alia*, teacher's receipt of "continued . . . negative evaluations" did not constitute adverse employment actions under the NYSHRL and NYCHRL); *Santiago v. Dep't of Educ. of the City of N.Y.*, No. 502752/2012., 2014 NY Misc. Lexis 1092, at *6 (N.Y. Sup. Ct. Feb. 27, 2014) ("Generally, negative performance reviews or criticism of performance by themselves are not considered adverse employment actions under either the State Human Rights Law or the City Human Rights Law.") (citation omitted).

[19] The parties also disagree over whether a PEAP was required by HHC policy. *See* Defs.' Mem. at 6; Opp. at 20–21; Reply at 2. Regardless of whether the PEAP was required, it was not an adverse employment action because it did not have a materially adverse effect on Plaintiff's job.

### ii. Borzon's Replacement by Someone Outside of His Protected Class Permits a Reasonable Inference of Discrimination

As to the final prong of a *prima facie* case, a plaintiff must "introduce[] evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." *Holcomb*, 521 F.3d at 138. This factor is flexible and can be satisfied in different ways depending on the factual scenario. *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action].'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "In addition, an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41–42 (2d Cir. 2017) (quoting *Littlejohn*, 795 F.3d at 312–13) (internal quotation marks omitted). In fact, replacing a plaintiff with "someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial *prima facie* stage of the . . . analysis, including at the pleading stage." *Littlejohn*, 795 F.3d at 313 (citation omitted).

Borzon believes a reasonable inference of discrimination can be drawn from the fact that he was replaced by an African-American woman. Opp. at 21. He also points to facts he primarily offers to support his pretext argument: Guzman said Green was out to get him; Plaintiff was the sole employee that Guzman rated poorly, placed on an PEAP, or recommended

16

for termination;[20] Defendants' claims about MHC's poor financial performance during his tenure are mistaken; there are alleged inconsistencies in his supervisors' statements regarding his termination; and MHC mishandled his internal EEO Complaint. *Id*. at 21–23.

Defendants contend that no inference of discrimination can be drawn to support Plaintiff's *prima facie* claim. They argue, *inter alia*, that Plaintiff did not compare his treatment to the treatment of any specific comparable employees; that Plaintiff's replacement by a person who is outside of his protected class was six months after his termination; that Plaintiff's poor performance was repeatedly documented by multiple evaluators; that Guzman hired Plaintiff in addition to recommending his removal; and that Green took steps to help Plaintiff find another position before his termination. *Id*. at 8–13. *See also* Reply at 2–5.

The Court finds that Plaintiff's subsequent replacement suffices at this stage of the analysis. Lynette Stover, an African-American woman, was hired as the new Senior Associate Director of Patient Financial Services about six months after Plaintiff's termination. P.S. ¶¶ 122–23. Defendants argue that "[r]eplacement at so long a temporal distance cannot suffice to show a basis of causation," but cite to language regarding causation in the context of a *retaliation* claim. Reply at 3 (citing *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013)). In the context of retaliation, the court in the cited case determined that a three-month period between a plaintiff's complaint and his discharge is generally too long, standing alone, to support an inference of retaliation. *See id*. at 197–99. Although the timing of hiring a replacement can support an inference of discrimination, *Goonewardena v. New York Workers Comp. Bd.*, 258 F. Supp. 3d 326, 337 (S.D.N.Y. 2017), the case law in this Circuit does

---

[20] During Guzman's employment at MHC, from May 2011 to September 2015, Plaintiff was the only employee that Guzman gave an overall rating of "Needs Improvement" or placed on a PEAP. D.R.S. ¶¶ 275–77. Plaintiff was also the only employee at MHC whom Guzman recommended be terminated. D.R.S. ¶ 278.

not suggest that the two events—termination and replacement—must be close in time in order to support a *prima facie* claim for discrimination. *Littlejohn*'s holding that replacement by a person outside one's protected class "will ordinarily suffice for the required inference of discrimination" itself includes no temporal limitation, which comports with the rule that the evidence necessary to satisfy a plaintiff's burden at step one is minimal. *See* 795 F.3d at 312–13 (citations omitted).[21]

Accordingly, Plaintiff has established a *prima facie* case of discrimination.[22]

### 3. Defendants Have Offered Nondiscriminatory Reasons for Terminating Borzon, and Borzon Has Failed to Raise a Question of Fact as to Whether the Reasons Are Pretextual

#### i. Applicable Law

Because Borzon has established a *prima facie* case, he is entitled to "a presumption that [Defendants] unlawfully discriminated" against him. *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (citation omitted). The burden of production then shifts to Defendants "to proffer a nondiscriminatory reason for [their] action." *Id.* (citations omitted); *see also Littlejohn*, 795 F.3d at 307 (citations omitted). "[O]nce the employer articulates a non-discriminatory reason for its actions," the presumption created by the *prima facie* case "drops out of the picture." *James*, 233 F.3d at 154 (citations and internal quotation marks omitted). "[T]he burden [then] shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citation omitted), that is, to "demonstrate that the proffered reason was not the true reason (or in

---

[21] That said, if the replacement occurred many months or years after the termination, replacement by a person outside of the protected class would likely not suffice at this stage, even though the burden is a minimal one. Six months likely seems to be at the outer range of a gap in time that will still support an inference, albeit a weak one, of discrimination.

[22] Because his replacement suffices, the Court will not discuss Plaintiff's other proffered bases for his *prima facie* case.

any event not the sole reason) for the employment decision," *Littlejohn*, 795 F.3d at 307

(citations omitted). That burden "merges with the plaintiff's ultimate burden of showing that the

defendant intentionally discriminated against her." *Id.* at 307–08 (citations omitted). The

question then becomes "whether the evidence, taken as a whole, is sufficient to support a

reasonable inference that prohibited discrimination occurred." *James*, 233 F.3d at 156 (citing

*Reeves*, 530 U.S. at 146).

### ii. Defendants Sufficiently Identified Non-Discriminatory Explanations

Defendants assert that Borzon was fired because of his poor performance, which is

illustrated by, *inter alia*, his mismanagement of MHC revenue, his submission of flawed work-

product, and his inability to work well with his colleagues. Defs.' Mem. at 13–19; Reply at 5–8.

Defendants emphasize that such problems were included in his formal evaluations and PEAP.

Reply at 5–6, 8.

Plaintiff does not dispute that poor performance is a legitimate non-discriminatory reason

for a termination. Instead, he chooses to dispute Defendants' assessment that he was a poor

performer. To that end, the parties point to and argue about a range of financial performance

metrics that they believe support their respective views of Plaintiff's job performance. *See, e.g.*,

P.S. ¶¶ 132–154; D.R.S. ¶¶ 312–329. Defendants have put forward various examples of alleged

deficiencies in Plaintiff's performance that include, *inter alia*, poor Medicaid enrollment figures

as compared to other HHC facilities, an inappropriate email Borzon sent to a colleague, late

submission of a required metrics report and other tardy work product, general interpersonal

issues with coworkers, and errors in his calculation of financial metrics; Plaintiff disputes the

facts supporting a number of these alleged shortcomings. *See, e.g.*, P.S. ¶¶ 157–211; D.R.S.

¶¶ 320, 327.

The Court broadly finds these disputes to be immaterial, as the central issue is whether Defendants had adequate, non-discriminatory grounds to terminate Plaintiff based on their view of his performance, and not whether, for example, a different manager might have believed that MHC's financial metrics indicated that Plaintiff was doing an adequate job. There is no dispute that Plaintiff's supervisors told him, via two formal performance reviews and a personalized PEAP, that his performance was unsatisfactory across a range of areas.[23] "'[A]n employee's disagreement with [his] employer's evaluation of [his] performance is insufficient to establish discriminatory intent.'" *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 576 (S.D.N.Y. 2010) (quoting *Ricks v. Conde Nast Publications*, Inc., 6 F. App'x 74, 78 (2d Cir. 2001)). Though the parties may quibble over which revenue and billing metrics best capture Plaintiff's performance, Defendants—unopposed by Plaintiff—have met their burden of identifying his poor performance as a non-discriminatory reason for Plaintiff's termination.

### iii. Plaintiff Fails to Demonstrate Pretext

As previewed above, Plaintiff raises a variety of issues that he believes are evidence of pretext. Plaintiff relies primarily on his conversation with Guzman in which Guzman allegedly told him that Green was out to get him and wanted to fire him. Opp. at 22. He also interprets MHC's financial metrics to indicate that he performed well, and he asserts that some of the performance issues Defendants have raised were not included in his performance evaluations, essentially implying that they were fabricated to justify his firing. *Id*. He contends as well that there are inconsistencies in Green's and Guzman's accounts of his termination, arguing that

---

[23] For example, in Plaintiff's January evaluation, he received an overall rating of "Needs Improvement," with ratings of "Needs Improvement" in ten categories (and "Fully Competent" in 13 categories); each rating was accompanied by a comment providing a basis for the rating. Jan. Eval. He again received an overall rating of "Needs Improvement" in his March evaluation, garnering ratings of "Needs improvement" in nine categories (and a rating of "Fully Competent" in 15 categories). March Eval. Some of the deficiencies that Plaintiff's supervisors had identified in his first evaluation persisted through the period of his second evaluation. P.S. ¶ 101.

Guzman stated that he and Green thought Plaintiff should be terminated, while Green testified that she did not play any role in Plaintiff's termination. *Id*. at 22–23. Lastly, Borzon asserts that his EEO Complaint was mishandled because the EEO Officer failed to interview Brown-Gross, did not consult with in-house counsel, did not preserve her notes, and did not prepare a summary of her findings. *Id*. at 23.

In response, Defendants contend that Plaintiff has offered no admissible evidence that Defendants' explanations are pretextual and that the actual motivation for his removal was discriminatory. They dispute that the performance issues they have identified were not raised during Plaintiff's evaluations and in his PEAP, and in any event, argue that Plaintiff has made no effort to connect the alleged failure to provide feedback to Plaintiff's race. Reply at 8. Defendants also note that the EEO Officer interviewed Plaintiff and other individuals mentioned in his Complaint[24] and argue that her failure to speak to Brown-Gross is not evidence that the allegedly overheard conversation actually happened or that Plaintiff was discriminated against. Reply at 9. Defendants stress the fact that Plaintiff deposed numerous people regarding this alleged conversation, and none of them corroborated Plaintiff's story. *Id*.

Plaintiff has presented relatively little admissible evidence that might satisfy his burden at this stage. In its discussion of Plaintiff's *prima facie* case, the Court noted that Plaintiff's replacement by someone outside of his protected class raises an inference of discrimination. The fact that he was replaced by a person outside of his protected class is not, on its own, legally

---

[24] The EEO Officer, Luz Nazario, interviewed Plaintiff, Davila, and Alexander, but she did not interview Brown-Gross. D.R.S. ¶ 256–62. Nazario did not confer with HHC's employment counsel as was her normal practice because she was transitioning out of her role, and she did not complete a summary of her investigation. D.R.S. ¶¶ 263–65. *See also* Excerpts of Deposition of Luz Nazario, August 17, 2017 ("Nazario Depo.") [Dkt. 35-3] at 47:8–22, 56:13–57:24.

sufficient at this stage, however.[25]  Reviewing the remainder of the record and the parties'

arguments, the only other evidence that even remotely suggests racial discrimination consists of

two conversations: the purported conversation among Davila, Collymore, and (later) Alexander

that was allegedly overheard by Brown-Gross and relayed to Plaintiff; and Plaintiff's

conversation with Guzman in October or November 2014, in which Guzman allegedly told

Plaintiff that Green was out to get Plaintiff and wanted to fire him.  Defendants dispute

Plaintiff's version of both of these conversations, but even if Plaintiff has accurately relayed

what Brown-Gross and Guzman said to him, these out-of-court statements are classic hearsay if

introduced to prove that Green harbored a discriminatory intent, and are thus inadmissible to

support Plaintiff's claims.[26]  "A party cannot rely on inadmissible hearsay in opposing a motion

for summary judgment . . . absent a showing that admissible evidence will be available at trial."

*Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015) (quoting

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985))

(internal quotation marks omitted), *aff'd sub nom. Abdel-Karim v. Egyptair Holding Co.*, 649 F.

App'x 5 (2d Cir. 2016).  Although Green is a party opponent, so that her out of court statements

are admissible, Fed. R. Evid. 801(d)(2), there remain hearsay links for both conversations for

which there are no applicable hearsay exceptions.  Nor has Plaintiff presented any other theory

by which these statements would be admissible and validly considered on this motion or at a

subsequent trial.  Further undercutting Plaintiff's desire to rely on these conversations, the sworn

---

[25]     A replacement by a person outside of a plaintiff's protected class may be probative of pretext but is insufficient, standing alone, to prove pretext without evidence that the replacement was less qualified.  *See Goonewardena*, 258 F. Supp. 3d at 341 (citations omitted).  Here, Plaintiff has adduced no evidence regarding Stover's qualifications.

[26]     The pertinent portion of the Davila/Collymore conversation, to wit, that Green told one of them that Borzon did not fit in because he is white, is second or third level hearsay if offered to prove that Green's complaints about the quality of Plaintiff's job performance are pretextual.

testimony does not support Plaintiff's version of the alleged conversations. *See, e.g.*, Guzman

Depo. at 97:24–99:16, 203:17–24; BG Depo. at 12:2–17:15; 28:2–29:9; Excerpts of Deposition

of Maria Davila, July 27, 2017 ("Davila Depo.") [Dkt. 29-17] at 70:10–76:13.[27]  Accordingly,

there appears to be no admissible evidence from which a juror might conclude that Green ever

told anyone that she wanted to get rid of Borzon because of his race.

  Plaintiff's other purported bases for a finding of pretext are also inadequate.  While the

parties dispute the upshot of MHC's performance metrics, and whether and when Guzman and

Green communicated to Borzon his alleged deficiencies, even if Plaintiff's version of this

evidence were true (and, as the non-moving party all disputes must be resolved in his favor), it is

undisputed that he received feedback both formally and informally on several occasions prior to

his termination, and it is undisputed that the feedback reflected dissatisfaction with his work.

Plaintiff has adduced no admissible evidence that any alleged fabrication of additional

performance deficiencies had anything to do with his race.

  The alleged inconsistencies in Green's and Guzman's accounts of Plaintiff's termination

are immaterial and do not support a finding of pretext.  Plaintiff argues that Green did not believe

he should be terminated.  In fact, Green testified that she suggested Plaintiff work in a different

role; that she did not play a role in his termination; and that she and Guzman were "in shock"

when he was fired.  P.S. ¶ 106, 115; Green Depo. at 142:7–47:23.  Regardless of her input into

the decision to terminate the Plaintiff, there is no dispute that Green and Guzman thought that

Plaintiff was not right for his job in PFS and should be removed from that role, even if they

differed on what would happen after that.  *See* Green Depo. at 142:7–47:23; Guzman Depo. at

197:6–99:17.  Accordingly, as the evidence indicates both supervisors had concluded that

---

[27]  The excerpts of Alexander's deposition filed by the parties do not contain questions regarding the alleged conversation, while the parties have not filed any portions of a deposition of Collymore.

Plaintiff's performance was inadequate, these alleged inconsistencies are immaterial; no reasonable juror could infer from those differences that Defendants' reasons for terminating Borzon were pretext for an invidious motivation.

Lastly, Plaintiff's arguments regarding the alleged mishandling of his EEO Complaint are insufficient to create a triable question of fact. First, even though the evidence suggests that Nazario deviated from her standard practice, Plaintiff's 56.1 Statement appears to credit Nazario's explanation that this was because she was transitioning out of her role rather than because of racial bias towards Plaintiff. *See* P.S. ¶¶ 263–64; D.R.S. ¶¶ 263–64 ("Ms. Nazario's practice is to consult Health and Hospitals Corporation's Chief Employment Counsel, Blanche Greenfield, '[f]or review and advice' on internal investigations. . . . In the case of Mr. Borzon's investigation, Ms. Nazario did not do so because she was 'transitioning out' and, therefore, 'didn't have time.' . . . She testified that, '[g]oing from one facility to the next,[28] it was a transition so a couple of things weren't closed out. Q. And this was one of them? A. Yes.'"). Plaintiff has adduced no evidence that Nazario's alleged mishandling of the investigation was motivated by or indicative of racial bias. Moreover, to the extent that the EEO investigation may have been inadequate, Plaintiff has had the opportunity in the instant litigation to seek documents and depose those purportedly involved in the alleged conversations that were at issue in his EEO Complaint. As noted above, he has generated no support for his claims that a more thorough EEO investigation might have captured. There is simply no admissible evidence regarding the EEO investigation from which a reasonable juror could determine that Defendants' proffered explanations for Plaintiff's removal were pretextual.

---

[28]     Nazario had been reassigned to a different HHC hospital.  Nazario Depo. at 5:9–6:25

In short, although Plaintiff was able to establish a *prima facie* case of discrimination, there is simply no admissible evidence from which a reasonable juror could find that Defendants' explanations were "not the true reason[s] (or in any event not the sole reason[s]) for the employment decision . . . ." *Littlejohn*, 795 F.3d at 307 (citations omitted). Borzon bears the burden not only of showing that Defendants' proffered reasons are false, but also that a jury could find that a discriminatory reason was more likely than not a motivation for Defendants' actions. *See Holcomb*, 521 F.3d at 138 (a plaintiff must show that "the employer's proffered reasons . . . were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors") (citations and internal quotation marks omitted). He has not met that burden. Defendants are, therefore, entitled to summary judgment on Plaintiff's discrimination claims.[29]

### C. Defendants Are Entitled to Summary Judgment on Borzon's Retaliation Claims

The first through fourth causes of action in the Complaint allege retaliation under Title VII, § 1981, the NYSHRL, and the NYCHRL, respectively. *See* Compl. ¶¶ 42–57. Defendants move for summary judgment as to all four claims. *See* Notice of Mot.

### 1. Applicable Law

Retaliation claims are also evaluated under the *McDonnell Douglas* burden-shifting standard.[30] *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v. Hamilton*

---

[29] Although the test for NYCHRL discrimination differs from that for the other discrimination claims, the Court also finds, for the reasons discussed above, that there is no admissible evidence from which a reasonable juror could find that discrimination played any role in Borzon's termination. *See Mihalik*, 715 F.3d at 110 n.8.

The Court notes as well that Plaintiff made no effort to oppose Defendants' arguments regarding his § 1981 discrimination claim and *Monell* liability, and offered no evidence regarding any relevant municipal policy or custom. *See* Defs.' Mem. at 20–21; Reply at 10 n.5. *See generally* Opp. Accordingly, this provides an additional reason to grant the Defendants' motion for summary judgment as to the § 1981 discrimination claims.

[30] "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination . . . and that, as a result, the employer engaged in conduct that was

*Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)); *see also DeLuca v. Sirius XM Radio, Inc.*, No. 12-CV-8239, 2017 WL 3671038, at *23 (S.D.N.Y. Aug. 7, 2017) (citations omitted). First, the plaintiff must establish a *prima facie* case. *Hicks*, 593 F.3d at 164 (citations omitted). "If the plaintiff sustains this initial burden, a presumption of retaliation arises. . . . The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (quoting *Jute*, 420 F.3d at 173) (internal quotation marks omitted). Upon such a showing, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action. . . . A plaintiff can sustain this burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause [of the actions] . . . ." *Id.* (quoting *Jute*, 420 F.3d at 173; *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

### 2. Borzon Has Established a *Prima Facie* Case of Retaliation

A plaintiff establishes a *prima facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute*, 420 F.3d at 173 (citation and internal quotation marks omitted). Defendants have conceded the first three prongs, citing Borzon's report to Guzman in late 2014 and his EEO Complaint as protected activity, and his termination as the adverse action.[31] *See*

---

reasonably likely to deter a person from engaging in such action . . . ." *Mihalik*, 715 F.3d at 112 (citations omitted). As with the other retaliation claims, a plaintiff bringing NYCHRL claims must present evidence supporting the "requisite causal link between [his] complaints and any alleged retaliatory action." *Mazur v. New York City Dep't of Educ.*, 621 F. App'x 88, 90 (2d Cir. 2015) (citation omitted). In other words, as with its federal and state counterparts, "[u]nder the NYCHRL, a plaintiff still must establish that there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for his termination was pretextual or motivated at least in part by an impermissible motive." *Goonewardena*, 258 F. Supp. 3d at 346 (citation and internal quotation marks omitted).

[31]     Plaintiff does not assert that his performance evaluations or PEAP were adverse employment actions in the context of his retaliation claims. *See* Opp. at 23–24.

Defs.' Mem. at 22. Therefore, the parties only dispute the causation prong of Borzon's *prima facie* retaliation claims.

As to this fourth prong, "proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (alteration omitted). "[T]emporal proximity can support an inference of retaliation for purposes of establishing a *prima facie* case, [but] the proximity must be very close." *Dhar v. City of New York*, 655 F. App'x 864, 865–66 (2d Cir. 2016) (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)) (internal quotation marks omitted). Courts in this District generally find two or three months to be the outer limit for establishing causation based on temporal proximity. *See, e.g.*, *Lambert v. Trump Int'l Hotel & Tower*, No. 15-CV-582 (VSB), 2018 WL 1633765, at *11 (S.D.N.Y. Mar. 31, 2018) ("[T]he passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line.") (citations omitted); *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 538 (S.D.N.Y. 2017) ("The interview took place less than two months after the discussion with Amodio, an amount of time that the Second Circuit has found to be sufficient for the purpose of establishing temporal proximity.") (citations omitted); *Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 586 (S.D.N.Y. 2017) ("Generally, three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.") (citations, alteration, and internal quotation marks omitted).

Nonetheless, "temporal proximity alone is not enough to establish pretext in this Circuit."[32]

*Abrams*, 764 F.3d at 254 (citation omitted).

Defendants contend that the time gaps between Borzon's termination, on the one hand, and his complaints to Guzman and to the EEO Office, on the other, are simply too long to establish a *prima facie* case. Defendants also argue that the performance review that was provided prior to any protected activity undercuts any inference of causation arising from the temporal proximity of his termination to his protected activity. *See* Defs.' Mem. at 22–25; Reply at 9. Plaintiff dedicates approximately one page of his Opposition to his retaliation claims, and offers no direct response to Defendants' arguments regarding this aspect of proving a *prima facie* case. *See* Reply at 23–24.

Plaintiff's complaint to Guzman occurred in either late November or mid-December 2014. P.S. ¶ 57; November Email; Borzon Depo. at 56:11–25, 78:6–80:11. At best, this report preceded Borzon's termination on April 15, 2015 by four months. Accordingly, the Court finds that it is too distant in time to support an inference of causation. In contrast, it appears that the EEO Complaint was filed about three months before Plaintiff was terminated, and Green learned of the EEO Complaint as little as two months before his termination. *See supra* note 11. The Court finds that this short lapse of time is sufficient to support a *prima facie* claim for retaliation, even though the Defendants had provided a negative performance review and other informal feedback prior to Borzon's filing of the EEO Complaint.

In all, there is sufficient evidence for a reasonable juror to infer that Borzon's internal EEO Complaint was the cause of his termination at the first step of the analysis.

---

[32] "[A]llegations of temporal proximity alone are also insufficient to demonstrate pretext even under the NYCHRL." *Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551 (HBP), 2016 WL 4362204, at *22 (S.D.N.Y. Aug. 15, 2016) (citations omitted) (collecting cases), *on reconsideration*, No. 09 CIV. 8551 (HBP), 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017).

### 3. Defendants Have Offered Non-Retaliatory Reasons for Their Adverse Actions, And Borzon Has Failed to Raise a Question of Fact as to Whether the Reasons Are Pretextual

To rebut the presumption created by Borzon's *prima facie* case, Defendants must proffer "a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164 (citation omitted). If Defendants do so, Borzon must come forward with evidence to show that "retaliation was a substantial reason for the adverse employment action[s]" or that "a retaliatory motive played a part in the adverse employment actions even if it was not [their] sole cause." *Id.* (citations omitted).

As discussed above regarding Plaintiff's discrimination claims, because Defendants have offered legitimate reasons for Plaintiff's termination, *see supra* Part II.B.3.ii, the burden returns to Plaintiff to demonstrate Defendants' retaliatory motive.

Plaintiff dedicates only a brief paragraph to his argument that the stated reasons for his termination are pretextual and that his firing was retaliatory. He again points to Green's statement denying having played a role in his termination as well as the mismanaged EEO investigation. *See* Opp. at 24. He also argues, without citation, that he was the only employee recommended for termination over a roughly five-year period.[33] *Id.*

Defendants respond that Plaintiff's only evidence supporting retaliation is the timing of his termination, which is insufficient, standing alone, to demonstrate pretext. Defs.' Mem. at 25–26; Reply at 9–10. They also argue that Plaintiff's Opposition fails to respond to their arguments and that he has essentially conceded that his claims are insufficient. Reply at 10.

---

[33] Presumably Plaintiff intended to argue that he was the only employee that *Guzman* recommended for termination during his tenure at MHC, which was about four years and four months. *See* D.R.S. ¶¶ 275–78. There is no evidence that Plaintiff was the only employee recommended for termination at MHC during a five-year window.

As with his discrimination claims, Plaintiff has failed to rebut Defendants' proffered explanations for his termination with any evidence that would support a finding of retaliation. The Court discussed above that, despite inconsistencies in testimony related to Green's role in Plaintiff's dismissal, it is undisputed that both Green and Guzman found Plaintiff's performance lacking and, after having conveyed such feedback both formally and informally, sought his removal from his position in PFS. Moreover, Plaintiff's crediting of Green's statement that "neither she nor Mr. Guzman played a role in Mr. Borzon's termination," Opp. at 24, merely begs the question of who *did* play a role in his termination, a question Plaintiff does not even attempt to answer. Eliminating Plaintiff's supervisors, the two people most likely to have retaliated for his complaint to EEO, takes the Court even further from identifying any evidence of a decision maker who harbored retaliatory intent.

The evidence regarding the EEO investigation fares no better. Plaintiff advances no cogent explanation how an allegedly inadequate EEO investigation would indicate to a reasonable juror that Plaintiff's subsequent termination was retaliation for the claim the EEO Officer inadequately investigated. There is no allegation that the EEO Officer conspired with Plaintiffs' supervisors, or anyone else with the power to terminate Plaintiff, to bungle the investigation. Instead, as discussed in the discrimination claim analysis, Plaintiff appears to have credited Nazario's explanation for why she handled the investigation as she did—she was in the process of transitioning out of MHC. *See* D.R.S. ¶¶ 263–64. There is no evidence tying the investigation to alleged retaliation.

And as to the argument that Borzon was the only employee that Guzman recommended for termination during his time at MHC, Plaintiff makes no attempt to explain how this would

indicate that Guzman's recommendation to fire him, which followed numerous instances of formal and informal feedback, was in retaliation for his EEO Complaint.

In all, Defendants are correct: the only evidence Plaintiff has presented from which a juror might conclude that his termination was in retaliation for his EEO Complaint is the timing of the two events. As noted above, mere temporal proximity is insufficient at this stage of the analysis for all of Plaintiff's retaliation claims. Notwithstanding his speculation that he was fired because of his EEO Complaint, Plaintiff has failed to meet his burden in response to the evidence of Defendants' legitimate bases for his termination. Defendants are, therefore, entitled to summary judgment on the retaliation claims.

## III. CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk is respectfully directed to close the open motion at Docket Entry 26 and to close the case.

**SO ORDERED.**

Date:  **June 29, 2018**            _____
       **New York, New York**                  **VALERIE CAPRONI**
                                        **United States District Judge**